The President of the U.S. Bankruptcy Code, which says that a bankruptcy trustee may surcharge a secured creditor's collateral for his reasonable and necessary expenses of preserving or disposing of the property to the extent it benefits the creditor. We're focused today, for purposes of this appeal, on the benefit part of this statute, and that is, were these expenses, these surcharged expenses, for the benefit of Southwest Securities the case? This Court said in its Delta Towers decision in 1991 that in order to show benefit in the manner required under 506C, the expenses must have been incurred for the primary benefit of the secured creditor and have resulted in a direct and quantifiable benefit to that creditor. The burden of proof on both those elements is on the party seeking to surcharge, here the trustee, the appellee. We think the trustee has failed to carry his burden on both aspects of this test. These expenses were not incurred for the primary benefit of Southwest Securities, and they did not result in a direct and quantifiable benefit to Southwest Securities. It's not for the primary benefit of Southwest for three reasons. One, the trustee abandoned the property when it became apparent that he couldn't sell it for enough to cover the first lien debt of Southwest Securities, which means that his only purpose for holding the property pre-abandonment was to try to sell it for a price high enough to benefit creditors junior to Southwest Securities. Second, the trustee judicially admits in several portions of the record his purpose for incurring the expenses was to benefit junior lien holders, not Southwest Securities. And third, these were ordinary general administrative expenses, which were incurred for the benefit of all creditors, for the bankruptcy estate in general, with no special or primary benefit to Southwest Securities. Regarding abandonment, this case raises an issue not previously considered by this Court, although it has been decided by other courts, notably the Seventh Circuit in the Tremex decision, which has been cited with approval by this Court. Here you have a situation where the trustee holds property that is the collateral of the secured creditor, holding it for the express purpose of trying to sell it for more than the debt, later abandons because he can't find a buyer. The issue is, can he surcharge expenses prior to abandonment? We say no, he can't surcharge in this situation because the expenses, as a matter of law, could only have been incurred for one purpose. He held the property. Incurring expenses is a consequence of his decision to hold it in hopes he could sell it for enough to benefit junior creditors, get enough money over and above the first lien. But as it turned out, since the property wasn't worth enough to give the unsecured creditors any recovery, as it turned out, all these maintenance expenses didn't provide any benefit to the unsecured creditors. So why should we be charging it against the estate as a whole when the estate didn't benefit in any way? Looking back on what happened, I mean, everyone thought there was this value, but it wasn't there. Well, Your Honor, we say that the two parts of the test actually have two different purposes. The primary benefit test is a forward-looking test. You look at, and the court said it in the Delta Towers decision, for what purpose did the claimant incur the expenses? And that means at the time he incurred them, what was his purpose? If it was to benefit junior creditors, then his intent was to benefit somebody other than Southwest Securities and not for Southwest's primary benefit. So yes, in hindsight, there was no benefit to anyone, but his purpose was to benefit junior creditors. Now the second part of the test is a hindsight test. It looks at actual results. We think that we passed that test as well, and the trustee fails it. But the first, and I will cover that, but the first part, the primary benefit test, the trustee fails for that reason. We are not the first ones to say that, Your Honor. As I mentioned, the Tremex court said it first. That's a Seventh Circuit decision from 1996. The facts were similar. That trustee held collateral property for a period of time, incurred expenses, and filed a motion to abandon and surcharge. The Seventh Circuit expressly said that the expenses incurred prior to abandonment as a matter of law were not surchargeable because they could not have been for the benefit of the secured creditor. It seems like this whole statute is aimed at preventing unjust enrichment, and it does seem this thing is basically on the market for a year. There's one offer that your client rejects because you would have ended up losing money, understandably. So aren't all these maintenance expenses at the end of the day benefiting you? I mean, even if it was abandoned day one, and the trustee never tried to sell it, doesn't the record indicate that for a year this would have been on the market, and I, you know, you all would have paid for the insurance and the security and all that to keep it in good shape? Well, Your Honor, I think that goes to the direct benefit part of the test. We didn't have any direct benefit because if we had been able to foreclose on day one, if everyone wasn't under the mistaken impression that the property was worth so much money, and we could have foreclosed because the stay would have been lifted, then we could have sold that property for far less money than the trustee. We were only owed $3.7 million, and as you point out, Your Honor, there was an offer eventually reached for or given for $4 million. We could have sold it, and we would have, and not incurred all those expenses. We could have sold it quicker and cheaper, and therefore, we had no interest in the trustee holding that property for any period of time beyond the first day, other than the fact that everybody thought it was worth more, so a motion to lift stay would have been futile. But I guess, why are you saying with such confidence that you could have sold it for less money? My understanding is on the market. It wasn't like it was priced at $6 million. I thought it was just on the market. Any borrowers, you know, will take any offers and consider them. You're saying you would have taken that one offer that came in? Well, because everyone thought that this property was so valuable, we were allowed to accrue post-petition interest, default interest, all our fees, so the claim kept rising. But on the day the case was filed, as is reflected in the proof of claim, it was $3.7 million. That was the claim. So a $4 million offer, if we had been able to put it on the market, list it for $3.7 million, there's every reason to believe we could have sold it. And it's very similar to this Court's decision in the two hotel cases this Court has decided, Delta Towers and PC Limited, where those creditors just wanted to foreclose, but they weren't allowed to for various reasons, and the Court found that those creditors had no interest, therefore there was no direct benefit for all these utilities, electric, gas, and water. Just wasn't a benefit. The matter of the State Design Court, which was a district court opinion from the Eastern District of Michigan, carefully followed Tremex, that case was from 1996 as well. They said that mere expenses of retaining possession during the period before abandonment are not subject to surcharge, and pointed out that the Seventh Circuit did establish a rule of law regarding abandonment, and said that there is no primary benefit to the secured creditor for pre-abandonment expenses. So we say that the Bankruptcy Court erred as a matter of law by ruling otherwise. So you're saying the bright line is whether it's been abandoned? Well that is — Pre-abandonment can't be given under this statute. Right. That is one reason that we say there was no primary benefit. Right. I mean, let's say, though, instead of just paying maintenance expenses like insurance and security, they built a new warehouse on this property because they thought that would increase its value on the market. But then it gets abandoned. You'd say even that, even though it increased the value of the property, wouldn't be recoverable under this? Well, presumably, they wouldn't have been building it for the creditor's benefit, and the creditor wouldn't have had a secured interest in it. I mean, at that point, it doesn't seem like that would have benefited the secured creditor. It may have raised the value of the property, but we would have never realized it. There are judicial admissions in the record, Your Honor. In the surcharge motion and the abandonment motion filed by the trustee, the trustee does admit that his purpose was to benefit junior creditors. And then I wanted to speak just for a moment about policy. Your time is expired. Okay. Thank you, Your Honor. Mr. Kinzer? Kinzer. Yes, Your Honor. Thank you. May it please the Court? Yes, sir. I'd like to discuss three issues, if time permitting. One is the issue of jurisdiction, subject matter jurisdiction. The other is to go with that purpose prong that the Court inquired about with Mr. Geylik. And then if there's time, the issue of consent. This Court spoke in Barogio Springs Bank v. Schooner River Lumber in 2009 that once property is abandoned out of the estate, the bankruptcy court loses jurisdiction and any power to surcharge whatsoever. That is consistent with a number of other cases that we cited in our briefs below in the bankruptcy court. But once abandoned, the bankruptcy court loses the power. It has no jurisdiction over the property and cannot surcharge it. In this case, the abandonment order, which was an agreed order, was effective September 13th. The surcharge order was not issued until September 24th. So as of the 13th of September, the bankruptcy court lost the power to surcharge, and therefore this Court should reverse and render on the basis that the bankruptcy court had no jurisdiction. As the issue of the benefit, and to be more specific about the first prong of the benefit test, it is clear in this, in Delta Towers, that the Court said it's a two-part test, that the claimant must incur the expenses primarily for the benefit of the secret creditor, and the expenditures must result in a quantifiable direct benefit. The Court cites to a number of prior authorities, one of which is Brookfield Production Credit Association, an Eighth Circuit court, that says the test slightly differently. To recover the claimant must expend the funds primarily to benefit the creditor, who must in fact directly benefit from the expenditure. And this test is adopted verbatim in a number of different courts. So the Fifth Circuit is adopting that interpretation in Delta Towers, which says it's two parts. It's not just looking backward and saying who actually benefited, as the bankruptcy court did. It's why are we incurring the expenses? Sort of like in the Warner case, where this Court said, in Bank, that we need to look forward at the time that the expenses are incurred. Why are we doing it? And in this case, when a trustee comes to a secured creditor and says, I want to try and get money for somebody else, will you cooperate? And we say, we will, but we reserve all of our rights to object to any surcharge, because you're doing it for somebody else. And then for the trustee to come back and say, well, we couldn't get enough for the other people. We could have got enough for you, but because we've spent all this money and we want all this money off the top, it's not enough to fill your bucket. We would have had a full bucket had they abandoned the property at the beginning of the case. The interest wouldn't have run. And the question Judge Costa about whether we would have expended this money anyway, that gets into the realm of speculation. And we're not allowed to speculate under the authority of the Fifth Circuit as to what this benefit was or wasn't. In addition, it has to be a benefit other than just spending the money. If you look at the cases, it talks about spending X dollars in order to recover some other benefit. In this case, it's just the money. In addition, the cases talk about it has to be a benefit that only the trustee could have gotten, that we couldn't have gotten otherwise without the trustee's intervention. So all of these things work against the trustee in this case, because they come to us and say, will you cooperate, will you forego, as it says in the plan, your right to foreclose so we can try and get money for other people. And they say it even in their brief. This is what they say in their brief. Everyone, therefore, reasonably believed that the bankruptcy estate owned between $1.3 million and $2.3 million of equity in the lariatal property. Should the trustee have immediately abandoned or should he have tried to obtain that large equity, it's not really equity, it's value above Southwest debt that was owed to somebody else. Should the trustee have immediately abandoned or should he have tried to obtain that large equity for the benefit of the estate, and in order to obtain that value, should the trustee not have made basic expenses to preserve and enhance the value of the property? Clearly, even in their brief before this court, the trustee admits that the only reason that they were trying to sell the property was to get more than what they owed us. And the cases are very clear, and there's no contrary authority, that the benefit to the secured party is to get the property to them, not to hold it to sell it. And ask this question, what was the purpose for why the trustee held the property for sale? And the answer is for the benefit of others besides Southwest. Never does the trustee ever say, in testimony or otherwise, that the primary reason they were spending the money was to benefit Southwest securities, because that's not the truth. It was to benefit primarily somebody else. So if they don't meet the first part of why they're spending it, then the second part doesn't matter. But even in that regard, the cases say we didn't benefit. The secured benefit does not benefit from spending more money when we could have had the property in control of what we could have done. Thank you, Your Honor. We ask that the Court reverse the measure. Mr. Morris. May it please the Court. My name is Lee Morris, and I represent Milo Segner as trustee of the Domestyle, Inc. Creditors Trust that was created pursuant to the confirmed Chapter 11 plan in the Domestyle bankruptcy case. Less than two weeks before the bankruptcy filing, Mr. Segner had been appointed as the receiver of Domestyle, and upon Domestyle's bankruptcy filing was authorized by the bankruptcy court to remain in control of Domestyle as the debtor in possession, having the rights and obligations of a trustee under the bankruptcy code. Therefore, for ease of reference, I'll simply refer to Mr. Segner as the trustee throughout my argument. The general rule in bankruptcy is that the costs of administering property of the estate are to be borne by unencumbered property of the estate. However, under equitable principles, Congress has recognized an exception to this general rule under Section 506C of the bankruptcy code, authorizing reasonable and necessary costs and expenses of preserving the collateral of a secured creditor to be charged against such collateral to the extent of any benefit to the secured creditor. In this case, Southwest concedes that all of the expenses incurred on insurance, security, utilities, and repairs and maintenance for the Redo property, Southwest Collateral, were both reasonable and necessary to preservation of the property. Southwest's focus is on the benefit language of Section 506C, as you've heard, and the requirements developed by this court in relation to same, and now this court, and now asks this court to adopt wholly inappropriate, inequitable, and unduly restrictive new and additional requirements. I do want to touch upon two things that have been raised that we were not able to brief on that have been raised by Southwest. First, Southwest in its reply brief argues that the bankruptcy court improperly admitted expert testimony by Ken Pearson. And to put this in context, Mr. Pearson is a managing, as he testified, Mr. Pearson is the managing director of CBRE, a global real estate firm. He had specialized experience in the marketing of distressed property, having, among other things, represented the FDIC in the marketing of roughly 4,000 properties that had been taken over. He had familiarity with the Laredo property as the trustee's retained real estate broker in the case. He walked through things that were critical to the- They didn't challenge his qualifications or the reliability of his testimony in the district court, did they? They did not object to- And they didn't raise it in their opening briefs. I mean, I don't think that's properly before the court, so you may want to focus on the main issue. Don't want to waste your time on that. I'm sorry, I- I think Judge Benavida just agreed with what I was saying. Don't waste your time on that issue. Okay, very good. Thank you. And that was the point we were going to make. The other point that's just been raised today, and I realize that subject matter jurisdiction is a matter that can be raised at any time, is with respect to the abandonment. And let me just put the abandonment in context. Under the plan, Section 5.5 of the plan, there were specific provisions with respect to how the property was going to be dealt with. There was a sale deadline of May 1, 2014. That's in Section 5.5, Little 4 of the plan. If there was no sale or a contract in hand by that deadline, Southwest was to foreclose or take a deed in lieu. That's in Section 5.5, Little 5. Southwest refused to do either of those things, leaving the trustee with this property and not knowing what to do with it. So he forced the issue by filing a motion to abandon, which is awkward at best because, in effect, the property had already vested in the trust. It wasn't really property of the estate. But I do want to talk about timing issues. And obviously that issue, by the way, the abandonment, was agreed upon that what would happen is Southwest would post the property for foreclosure and would also pick up all expenses of preserving the property from June 1 forward of 2014, which is why the actual surcharge expenses awarded by the bankruptcy court were less than what had been requested in the motion because June forward they agreed to pick up. But from a timing perspective, this is important. The ruling by the bankruptcy judge for surcharge was issued at the end of the conclusion of the hearing on August 13, 2014. That was prior to the entry of the abandonment order. The abandonment also, abandonment doesn't equate to transfer the property. It's just simply, in a normal context, removes both the benefits and the burdens of the property from the estate, at which point the secured creditor can move to post it for foreclosure. And, in fact, 28 U.S.C. Section 1334E1 points out that the court has jurisdiction over not only property of the estate but property of the debtor. So any abandonment in the true sense of the word would just simply cause the property to be part of the debtor's property, and clearly the court retained jurisdiction over the property until the time of foreclosure, which did not happen until after the surcharge order had been entered. I would also point out to your honors that the parties agreed to a substitute of the surcharge collateral in this case as part of a stay pending appeal. Specifically, the property was replaced by an escrow fund that's specifically subject to the court's jurisdiction, the bankruptcy court's jurisdiction as to its disposition. So we don't think that there's any subject matter jurisdiction problems here. Let me turn to abandonment, if I may. With respect to abandonment, Southwest asked this court to rule as a matter of law that no charges incurred prior to abandonment can ever be recoverable as a surcharge. Now, of course, they based that argument on the Seventh Circuit's opinion in Trim X, which obviously is not binding on this court, and it's frankly kind of an odd case, and perhaps it's because it was not long after the bankruptcy code had been enacted. If you look at that case, the Seventh Circuit had explained that under the old act, bankruptcy act, surcharges had been limited to situations where the expenses of preservation were either A, incurred primarily for the benefit of the secured creditor, or B, were caused or consented to by the secured creditor. Then, strangely, it completely disregards the primarily for the benefit language that had been promulgated under the act and focuses solely on the cause or consent language in making its ruling in the case. And because in that case the secured creditor had neither caused nor consented to the expenses, even though there had been benefit to the secured creditor, it determined that the expenses were not surchargeable. Now, how is there, even looking in hindsight, forgetting their forward-looking sort of intent requirement, how is there a benefit to Southwest from this property being on the market for a year? Because, I mean, if you look at it, sure, it's their land that all these expenses were being paid for. But the reason this case is here is because everyone thought this land was worth more than it turns out to be worth, this property. And it sat on the market for a year with really no interest and no ability to obtain the value that people thought was there for the estate. And so how was the expenses of a year's time in maintaining the property, how did that benefit Southwest? Because all that was being done, again, forgetting intent, but just looking at it even in retrospect, all that was being done while any sales would have gone to the unsecured creditors if it had been sold for above the security interest Southwest had. Well, the benefit, I mean, again, put this in context. The ultimate deal that was cut in this case under the plan was that the property would be marketed through May 1. And, again, like you said, if there was ultimately, if there was a recovery in excess or even in the range of what everybody was hoping it would be, then everybody would be happy. But that's not the way it turned out. Right. But the deal was up through May 1 of 2014, that was the understanding, is that the trustee would try to sell the property. And the trustee could only sell that property if he thought there was value for the estate because otherwise he had no business selling it, right, if there was no belief that it had some value to the estate. If the property, if any bid for the property came in lower than what Southwest's outstanding debt was, it had to go to Southwest and get Southwest's consent, which is exactly what happened here. They got an offer for $4 million subject to a number of contingencies in April 2014, went to Southwest, and Southwest's credit manager, Mr. Morgenfeld, pointed out that the debt at the time was in excess of that bid. And while they negotiated back and forth on whether or not the property, whether or not that bid should be taken, Southwest even encouraged the trustee to go back and try to push higher. So in the interim of during this agreement, while the property is going to be marketed, obviously there were expenses incurred on insurance, on repairs and maintenance and utilities. And in fact, I mean, obviously all those, as Judge Rhodes properly found, benefited the property, and hence Southwest only because at the end of the day they only got the property. But the length of time, doing all that for a year, I mean, once it got abandoned, my understanding is Southwest agreed. Then it's in our hands, we're trying to sell it, we should incur all these expenses. But the year's worth of expenses, the reason those expenses went on for so long without the property being sold is because there was this hope of selling it at a value where there could have been some return to the estate. So it seems to me, even in hindsight, why wasn't there value to the estate in that it had the opportunity? Sure, it didn't realize it the way things turned out. But didn't the estate receive something which was the opportunity for a year to try and sell this and gain some value for all the unsecured creditors? Well, while that has some appeal, that is clearly, there's no temporal limitation within Section 506C of the Bankruptcy Code as to when a surcharge can apply and when it can't. And frankly, the Bankruptcy Code represents a very delicate balancing of rights in relation to secured creditors. On the one hand, you have the automatic stay, which provides breathing room to get things in order, prevent a race to the courthouse by creditors, and, for example, to try to market property. On the other hand, you have Section 506B, which provides interest and fees and expenses to a creditor to the extent it's oversecured. You have Section 362D, which provides stay relief to a secured creditor to the extent it has concern about whether or not its collateral position is adequately protected. You have Section 363E of the Bankruptcy Code, which provides an avenue for secured creditors to preclude use of the collateral or expenditures in relation to the collateral that fail to adequately protect its interest. And at the end of the day, you have Section 506C, which says that if, at the end of the day, estate resources were spent to preserve the collateral and those expenses were reasonable and necessary to the preservation of the collateral, then they can be recoverable against the collateral to the extent to the benefit to the secured creditor. And here, the evidence, uncontradicted, is that the expenses that were incurred preserved at least the amount of those expenses. I'm sorry. Rather, the property was preserved in value by at least the amount of the expenses by undertaking those efforts. And, in fact, even within the first month of the case, Southwest had sent correspondence to the trustee to make sure that insurance was being maintained, security was being maintained, that the utilities were being maintained to preserve the value of the property. And Mr. Pearson also testified that throughout the case, and again, this was uncontradicted testimony, Southwest put on no evidence of its own. He put on testimony, or he testified, that all of the expenses that were incurred by the trustee would have been expenses that Southwest, as a prudent lender, would have incurred itself. Sure, but it would have had the ability to foreclose. I mean, if we affirm, isn't it true that Southwest is worse off than it otherwise would have been because for a year the trustee, as he should have, he had a reasonable belief, but because the trustee for a year was trying to gain some value for the creditors, isn't Southwest going to end up being worse off than if it had been, if they had been allowed to sell it on day one? Respectfully, Judge Costa, there's absolutely no evidence in the record of that. And this really kind of goes to their value. You don't know whether the market value would have been greater if they would have not put it in this trustee situation, a trust situation, or not. Or is there any evidence that Southwest, if it had been able to just go ahead and grab this property, or if the trustee hadn't used these efforts, that they would have been better off than at the end of this period? Yes, Judge Benavides, you're exactly right. There is no evidence with respect to any possible better outcome for Southwest in this case. And, in fact, I would point out, even Southwest's own counsel points out what really constitutes value. Now, as Mr. Kinzer asked the question of the trustee, and you understand that value is what a willing buyer and a willing seller will put on a piece of property. Isn't that right? And Mr. Segner responded, that's correct. So clearly even Southwest understands that what determines value is what a willing buyer and a willing seller will put on the property. And the only offer that was ever put on this property, after extensive marketing efforts, which Mr. Pearson testified included its own online marketing services, going to external marketing publication services, and including 25 in-person visits to the property, was this $4 million offer, which was below what Southwest's debt was at the time. And even Southwest at that point said, go out and try to do better. And they couldn't. So the only indication of value with respect to this property is that $4 million offer. And even that is a little bit questionable because there were contingencies with respect to that offer, including whether or not the buyer could get financing for it. So I think, you know, at the end of the day, you come back to really, Judge Costa, what I believe you pointed out early on, which is that the standard that has been recognized by this court is an equitable standard. In senior G&A operating, the court explained that the rationale for 506C is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs. This has been echoed in many other circuits, including the Eighth Circuit in Boatman's First National Bank, the Sixth Circuit in Foremost Manufacturing, the Fourth Circuit in JKJ Chevrolet, where in each case there's no mention with respect to cause or consent as a requirement. Instead, they explain that Section 506C is grounded in equity and designed to prevent a windfall to a secured creditor who has had the benefit of estate resources reasonably and necessarily spent on preserving the secured creditor's collateral. I also, just for the sake of rounding it out, we did talk about the argument with respect to them being oversecured. I think I've covered that. You know, and let me just provide this guidance to the court as I see it. The quantifiable indirect requirement appears to be an inherently collateral-based inquiry, while the primarily for the benefit of the secured creditor requirement appears to be a retrospective reality-based inquiry. Let me explain that. So with respect to quantifiable indirect, if you look at Delta Towers, Delta Towers points out that indirect or speculative benefits are insufficient, and Grimland also echoes that. So if you look at some of their cases that they cite in their briefing, take Brookfield Production, for example. The bankruptcy court, noting the sparse evidence introduced by the debtors, denied the debtors' surcharge request because the debtors failed to ascribe actual expenses to specific items of collateral. So in other words, the linkage was too loose. Any indirect benefit from the expenses was not recoverable. Baum's Bologna is another example, another one of the cases they cite. There, a law firm sought recovery of fees and expenses incurred during the course of the bankruptcy case from the bank's collateral. There was no evidence of any direct linkage between the services rendered and the collateral specifically, really just a general administrative expense overhead. The bankruptcy court denied the request because any benefit to the bank was, at best, indirect or secondary. And, you know, if you look through all the cases, again, when you're talking about quantifiable and direct, it's really looking at whether there's a sufficient linkage between the expenses incurred and the collateral at issue. And even Section 506C seems to point to this or point to a collateral-based inquiry because it provides for surcharge against the collateral as opposed to against the party itself. Now, with respect to primarily for the benefit of, as I've indicated, that really seems to be a what really happened after the fact inquiry. And you can look at senior G&A operating as an example of that. The court points out that it doesn't require exclusive benefit. It just simply requires that there was a primary benefit, which the court also points out is inherently fact-driven as to the inquiry as to what actually occurred. There, a secured creditor had a collateral production interest in a well. A work over the well was undertaken and a contractor went unpaid. And I'm sorry, but I see that I have run out of time. But hopefully you see the point, and we respectfully request an affirmation. Thank you, sir. Thank you. Mr. Galeck? Yes, Your Honors. With all due respect to Mr. Morris, I think he confuses general administrative expenses that are benefiting all the estate with surcharge expenses under 506C. We're not saying the trustee shouldn't have spent the money. If he was going to hold property in the estate, he's got a fiduciary duty to expend the money of the estate to reasonably protect and maintain property within the estate. But 506C is not meant to allow him to surcharge those expenses. It's clear under this Court's decisions that there must be some extraordinary benefit of those expenses to the secured creditor, which is consistent with the standard that they must have primarily benefited the secured creditor. That's Delta Towers you're getting that from? PC Limited, Your Honor. PC Limited from 1991 cited in the brief says that 506C is an extraordinary exception to the general rule that administrative expenses should be borne by the estate in general rather than one particular creditor. It's an extraordinary exception, but that doesn't mean the benefit has to be extraordinary. I mean, Delta Towers does talk about they didn't allow the surcharge there because the expenses that prevented the deterioration of the building were not quantified in the record below. But that does indicate that preventing something from deteriorating, which is really what we have here, as a legal matter, if you prove it upright in terms of the quantification, is recoverable. But, Your Honor, in that case, the court, the finding was there was no direct benefit. It was sent back down. It was remanded for further findings. But there was a finding of no direct benefit. And it's just like in this case where these expenses, utilities, the gas, water, electric, the security guard, those are the epitome of general administrative expenses. This case is very similar to Delta Towers in that Southwest Securities had no interest in incurring administrative expenses for the continued operation of this property in hopes of a sale. None. It was covered by the value of the property when this case began. Whether it was the value everyone thought it was, $6 million at the beginning of the case, or the value by the end of the case, which the only objective indication was that it might have been worth $4 million. $4 million was enough to cover it. We had no interest. Therefore, there was no direct benefit of those expenses. As for policy, Your Honor, as for the future effect of this case, if trustees can rely on this case, if you affirm, to hold property indefinitely in the estate, hoping that at some point there might be a sale that could benefit unsecured creditors, and the trustee himself, let's not forget, his commission is based on percentage that he, it's a percentage of what he distributes to creditors. If the trustee can do that, confident in the knowledge that at any time he can abandon the property and surcharge it for what he spent, then that skews the fiduciary duty of the trustee. It's a conflict. He doesn't then have the incentive to comply with his fiduciary duty to promptly liquidate assets within a reasonable period of time and distribute that money to creditors. So policy certainly dictates that you reverse and renew. Oh, but on the other hand, if he thinks there's this great risk if he tries to sell something to realize some benefit for the estate that his folks are going to get stuck with all those expenses, the policy argument on the other side is that he's going to try to get rid of this stuff too quickly. And that's the balance. I'm sorry. Yeah. That's the balancing act. The trustee has got a, the cases say that under Section 554, the abandonment section, the trustee has a reasonable period of time, and that's a fact-intensive inquiry. He's got a reasonable period of time to decide, to assess the estate's position. And in the Tremex case, I'm sorry, in the estate design case, relying on Tremex, the court said this, if you do it that way, it would skew the trustee's analysis. He would not have the, he would have the wrong incentive. He's got a reasonable period of time to assess the estate's position, but he can't take a year and a month, or really almost 14 months in this case, and hold on to it. Even if he thinks it's worth more, by that time he should have long ago realized he needed to get rid of the property. Thank you, Your Honors. We ask for a reversing render and for you to deny that he's charged, or at least so charged. Thank you, sir. Thank you.